UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 MAR 13 PH 5: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

PATRICIA HARLAND, )
)
Plaintiff, )
)
vs. )                          Civil Action No. CV-01-S-0294-S
)
HILB, ROGAL and HAMILTON )
COMPANY, )
)
Defendant. )

ENTERED

MAR 1 3 2002

## MEMORANDUM OPINION

Plaintiff, Patricia Harland, is a former employee of Hilb, Rogal and Hamilton Company,

formerly known as Hamilton & Shakelford Insurance Company (hereafter, "HRH"). She was

employed by HRH and its predecessor firm from 1985 until August 15, 2000, when she resigned.

During the last year of her employment with HRH plaintiff applied for a promotion, but was not

considered. She later was transferred to another department within the company. She then filed a

charge of discrimination with the Equal Employment Opportunity Commission.[1] Neither party

provided this court with a copy of plaintiff's original EEOC charge; therefore, the exact nature of

her claims is unknown to the court. Based upon the terms of a settlement agreement executed by

the parties on June 13, 2000, during the pendency of the EEOC investigative process, however, it

*appears* that plaintiff alleged she had been denied a promotion and transferred to another position

by HRH because of her sex, age, and disability, in violation of Title VII of the Civil Rights Act of

1964, the Age Discrimination in Employment Act of 1967, and the Americans with Disabilities Act

of 1990.

---

[1] *See* Defendant's evidentiary submission (doc. no. 11), Tab C, Exhibit 4.

In any event, plaintiff now contends that HRH subsequently retaliated against her for filing an EEOC charge, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* She also asserts that HRH failed to comply with the terms of the parties' agreement settling her EEOC complaint. The action presently is before the court on HRH's motion for summary judgment.

Following consideration of the pleadings, briefs, and evidentiary submissions, this court decided defendant's motion was due to be granted. The court was led to that conclusion by defendant's brief, which is at least above average in quality. Indeed, this court initially was inclined to base an order dismissing plaintiff's claims solely upon defendant's brief, but ultimately determined that more needed to be said about the proper legal basis for analysis of plaintiff's breach of contract claim. Thus, that which is said from this point to the beginning of § III.B herein may best be read as nothing more than a cursory gloss on that which already has been said, perhaps better said, by defendant's counsel. Section III.B *infra*, on the other hand, is new — in the sense that it discusses certain principles of federal law pertaining to the analysis of a plaintiff's claim that a defendant breached the terms of an agreement resolving discrimination claims asserted in the employee's (or former employee's) EEOC charge. Between those bookends, so to speak, the court inserts (adopts) the brief of defendant's counsel (doc. no. 12).

## I. STANDARDS FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

2

56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

## II. SUMMARY OF FACTS

Plaintiff began her employment with HRH during 1985. She was assigned to the Employee Benefits Department.[2] Her job title while so employed was not disclosed in the evidentiary materials submitted by either party; even so, her job duties consisted of selling third party administrator employee benefits insurance plans, as well as acting as a third party administrator of employee benefits for self-insured companies.[3] During 1999, HRH's Employee Benefits Department was separated into two components, known as the "Group Services" and "Third Party Administrator"

---

[2]Defendant's evidentiary submission (doc. no. 11), Tab C, at 23-24; *see also id.*, Exhibit 1, at 1.
[3]*Id.*, Tab C, at 24.

3

("TPA") departments. This division apparently occurred to enable the Group Services component to focus upon HRH's administration of the so-called "Jefferson Pilot program."[4] (Neither party provided any further details regarding this program.) Hube Dodd headed Group Services, and Wayne Bowling headed TPA.[5] Following the departmental separation, plaintiff was assigned to Group Services. Her job duties did not change.[6] Neither did plaintiff's salary or hours of work: while working in both Employee Benefits and Group Services, plaintiff's pay was based on commissions, and her regular work schedule was from 7:00 or 7:30 in the morning to approximately 3:00 in the afternoon.[7]

Shortly after the Employee Benefits Department was divided, Hube Dodd retired.[8] He recommended that John Donaldson replace him as head of Group Services, because Donaldson had been intimately engaged in development of the so-called "Jefferson Pilot program," and Dodd believed "it was vital that someone who was involved with those initial stages continue to be involved for HRH."[9] Plaintiff applied for Dodd's position as head of Group Services. She was not interviewed, however.[10]

Sometime during late February of 2000, plaintiff was informed that her position in Group Services was to be eliminated. Wayne Bowling, the head of TPA, offered plaintiff the opportunity to transfer to his department.[11] Plaintiff testified in deposition that the TPA spot offered to her was

---

[4]*Id.* at 3.

[5]Defendant's Brief in Support of Summary Judgment (doc. no. 12), at 3.

[6]Defendant's evidentiary submission (doc. no. 11), Tab C, at 24.

[7]*Id.* at 63-64.

[8]Defendant's Brief in Support of Summary Judgment (doc. no. 12), at 4.

[9]Defendant's evidentiary submission (doc no. 11), Tab D, at 54.

[10]*Id.*, Tab C, at 114.

[11]*Id.* at 24.

4

a "bottom of the ladder" position, but she felt compelled to accept the transfer.[12] She began working in the TPA department on March 1, 2000.[13] Shortly thereafter, plaintiff began treatments for depression, which continued through February 1, 2001.[14]

Following plaintiff's transfer to Bowling's supervision, she requested a 7:30 a.m. to 4:00 p.m. work schedule. Since most TPA employees worked flexible hours, Bowling granted plaintiff's request.[15] Plaintiff's salary was fixed at $38,000 a year, however, because her pay no longer was based on commissions.[16] Even so, the amount of her salary was determined based on plaintiff's earnings during the previous year.[17] Plaintiff's new job duties consisted of administering Consolidated Omnibus Budget Reconciliation Act ("COBRA") claims, typing file notes, and assisting other employees with the work of the department.[18]

Dissatisfied with her transfer and new compensation plan, plaintiff filed a discrimination charge with the EEOC on February 25, 2000.[19] On June 13, 2000, plaintiff and HRH reached a settlement agreement, which the parties submitted to the EEOC for approval. The agreement provided:

> 1. In exchange for the promises made by RESPONDENT [HRH] pursuant to Charge number 130A01160 CHARGING PARTY [plaintiff] agrees not to institute a law suit under (Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967[,] as amended, the Americans with Disabilities Act of 1990, as amended, based on EEOC Charge Number 130A01160).

---

[12]Defendant's evidentiary submission (doc. no. 11), Tab C, at 135, 154.

[13]*Id.* at 129, 136.

[14]*Id.* at 221, 225.

[15]*Id.* at 107.

[16]*Id.* at 124.

[17]*Id.* at 123.

[18]*Id.* at 137.

[19]*Id.* at 134.

2. Further we agree that submission of this agreement to [the] EEOC will constitute a request for closure of EEOC Charge Number 130A01160.

3. It is understood that this agreement does not constitute an admission by Respondent of any violation of (Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967[,] as amended, the Americans with Disabilities Act of 1990, as amended).

4. Respondent agrees that there shall be no discrimination or retaliation of any kind against CP as a result of filing this charge or against any person because of opposition to any practice deemed illegal under the ADA, the ADEA or Title VII, as a result of filing this charge, or for giving testimony, assistance or participating in any manner in an investigation, proceeding or a hearing under the aforementioned Acts.

5. This document constitutes a final and complete statement of the agreement between (the parties) or (between the CP, Respondent and EEOC).

6. The parties agree that the EEOC is authorized to investigate compliance with this agreement and that this agreement may be specifically enforced in court by the EEOC or the parties and may be used as evidence in a subsequent proceeding in which a breach of this agreement is alleged.

6A. CHARGING PARTY acknowledges that s/he has been advised to consult with an attorney and has been given a reasonable time to consider the agreement before signing. (ADEA CLAUSE).

7. As evidence of good faith effort to resolve EEOC Charge Number 130A0116

EXHIBIT 1

Respondent offers and Charging Party accepts the following proposal of settlement or (the parties agree): CP to be:

A.   Placement [sic] in a position of Senior Technical Specialist in TPA immediately

B.   Salary to be 40,000 per year, with an increase of $2500/yr. in 6 months and another increase of $2500/yr. after additional 6 months with satisfactory performance.

C.   Be allowed to take CEBS [Certified Employee Benefits Specialist[20]] training courses, at company expense, locally, with reasonable expenses for materials and supplies.

---

[20]Defendant's Reply Brief (doc. no. 14), Tab J, at 18.

D.   CP to be given the option, upon successful CEBS course completion of 1) $2000 cash bonus after passing of first course or 2) $500.00 per course.

E.   CP to be given an office if available in immediate dept. CP understands that office will be moving in the near future and that CP will be given comparable space, as other similar employees, most likely a cubicle.

F.   In the near future, a new personnel system will be introduced, and CP along with all other employees will receive career path development.

...

In reliance on the promises made in paragraphs     through     above, EEOC agrees to terminate its investigation and to not use the above referenced charge as a jurisdictional basis for a civil action under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination Act of 1967[,] as amended, or the Americans, with Disabilities Act of 1990, as amended. EEOC does not waive or in any manner limit its right to investigate or seek relief in any other charge including, but not limited to, a charge filed by a member of the Commission against the Respondent.

...

## EXHIBIT I

G.   Parties agree that an audit will be performed of CP's commissions for the period ending 3/1/00, to determine, what if any amounts, under her contract are due her. To be completed WITHIN 10 DAYS. When completed, AUDIT will be shown to CP. R to pay attys. fees of $5000.00 ... w/in 15 calendar days.
Parties agree to strict confidentiality and if either party breaches such, then they shall waive any benefits received. However, can be discussed w/those who have a strict need to know such as lawyer, acct.[21]

In order to implement the terms of the settlement agreement, Anne Connell, HRH's director

of Human Resources,[22] sent one electronic mail transmission to plaintiff on July 5, 2000, stating:

"We would like to pay your attorney fees as soon as possible. Do you have a bill that we could pay

from or do I need to call and get one?"[23] That same day, David Hobbs, president of HRH,[24] sent

---

[21]In addition to signing the agreement, the parties initialed paragraphs B and G. Defendant's evidentiary submission (doc. no. 11), Tab C, Exhibit 4, at unnumbered page 2-3.

[22]Id., Tab H, ¶ 1.

[23]Id., Tab H, Exhibit 1, at unnumbered page 2.

[24]Id., Tab G, at ¶ 1.

7

plaintiff an electronic mail message requesting information from her, so that the audit of her commissions could be completed.[25] The record also contains correspondence among HRH employees during the period from July 5 through August 14, 2000, relating to the commission audit.[26] (Plaintiff alleges, however, that she was not contracted regarding the commission audit until sometime after July 28, 2000.[27])

In accordance with the settlement agreement, plaintiff's salary was increased to $40,000 on July 15, 2000, retroactive to June 15, 2000.[28] HRH did not pay for plaintiff to attend CEBS classes, because plaintiff resigned her employment before those classes began.[29] Subsequent to the settlement agreement, plaintiff was moved from a desk to a cubicle; however, she was not moved into an office until a few days prior to her resignation.[30] Plaintiff alleges there were two offices available, and both offices were still available when she resigned.[31] Plaintiff was not assigned to an office until after she filed a state court breach of contract claim in the Circuit Court of Jefferson County, Alabama.[32] In that July 28, 2000 claim,[33] plaintiff alleged that HRH did not conduct the commission audit in a timely manner, or pay her the audited commission amount.[34]

In deposition, plaintiff testified that after she filed the state court breach of contract claim,

---

[25]Defendant's evidentiary submission (doc. no. 11), Tab H, Exhibit 1, at unnumbered page 3.

[26]*Id.*, Tab H, Exhibit 1.

[27]*Id.*, Tab C, at 145-47.

[28]*Id.*, Tab C (confidential excerpts), at 2-3; *see also* Defendant's Brief in Support of Summary Judgment (doc. 12), at 6.

[29]*Id.*, Tab C (confidential excerpts), at 3.

[30]*Id.* at 11.

[31]*Id.* at 5.

[32]*Id.*, Tab C, at 146; *id.*, Tab C (confidential excerpts), at 12.

[33]Defendant's Amendment to Answer (doc. no. 5) ¶ 21. Plaintiff's state court claim alleging breach of contract is still pending. *See* Defendant's Brief in Support of Motion for Summary Judgment (doc. no. 12), at 7.

[34]Defendant's Brief is Support of Summary Judgment (doc. no. 12), at 7.

David Hobbs called her into his office and said: "All you've done is create more work."[35]  Plaintiff further stated:

> I felt like the heat was turned up, that I was being pressured to resign.  There was some as far as the amount of work before that time; but after that suit was served was when, you know, I knew that if I wanted to retain my sanity, I needed to get out of there, and I felt like that was the intent. ... That's when I was told my hours would be over and above those required by other employees on a daily basis.[36]

Plaintiff further states that TPA utilized a computer application called "Resource Information Management Systems" ("RIMS") which assisted in the administration of COBRA claims.[37]  Plaintiff alleges that she was the only TPA employee who did not receive a RIMS password, even though that program would have helped her determine COBRA eligibility.[38]  She was, however, able to utilize the system by using other employees' passwords.  Plaintiff states that she requested a password, but she did not complain to Bowling when she did not receive one.[39]

Plaintiff also complains of several comments made by Bowling.  Plaintiff alleges that Bowling constantly asked if various projects were completed.[40]  Bowling also reprimanded plaintiff regarding the cost of printing materials,[41] when plaintiff mistakenly sent a large print job to a printer that used magnetic ink.  Bowling brought the print job to plaintiff and stated, "you need to be real careful where you are sending your printing because this magnetic ink is real expensive."[42]  Plaintiff

---

[35]Defendant's evidentiary submission (doc. no. 11), Tab C, at 208.

[36]*Id.* at 162.

[37]*Id.* at 202-3.

[38]*Id.* at 203.

[39]*Id.* at 203.

[40]*Id.* at 173.

[41]*Id.* at 163.

[42]*Id.* at 163-64.

interpreted the comment as hostile.[43]  Further, Bowling told plaintiff "that he would like to give [her] more responsibility, but since [she] had filed EEOC charges, he didn't know how much longer [she] would be there."[44]  Bowling explained in his deposition that he needed to know what plaintiff's intentions were after the EEOC charges were settled.[45]  Plaintiff stated that she felt intimidated by Bowling's statement; however, she did not notify or file a complaint with the Human Resources department.[46]

During mid-July of 2000, Kelly Griffin, Wayne Bowling's assistant, resigned.  Wayne offered the position to plaintiff, and she accepted.[47]  Upon plaintiff's assumption of Griffin's job, Bowling informed her that it would be necessary for her to work until 4:30 p.m., rather than 4:00 p.m., so that her hours would correspond with his.[48]  Plaintiff responded that working until 4:30 p.m. presented a problem for her, but Bowling stated that her work schedule was non-negotiable.[49]

Thereafter, plaintiff filed a second EEOC charge on August 6, 2000, alleging retaliation.[50]  A few days later, on August 15, 2000, plaintiff resigned.[51]  Upon receipt of plaintiff's resignation, Bowling informed her that she would be paid for a two week period, but that she need not report to work.[52]  The EEOC issued a notice of right to sue on November 9, 2000, and plaintiff filed this

---

[43]Defendant's evidentiary submission (doc. no. 11), Tab C, at 164.

[44]*Id.* at 154.

[45]*Id.*, Tab D, at 32.

[46]*Id.*, Tab C, at 158-59.

[47]*Id.* at 153-54.

[48]*Id.*, Tab D, at 29-30, 45-48.

[49]*Id.*, Tab C, at 205.

[50]Defendant's Brief in Support of Summary Judgment (doc. no. 12), at 11.

[51]Complaint (doc. no. 1) ¶ 10.

[52]Defendant's evidentiary submission (doc no. 11), Tab C, at 213.

action on January 31, 2001.[53]

## III. DISCUSSION

Defendant asserts that plaintiff cannot establish a claim of retaliation because she has not offered any evidence that she suffered an adverse employment action, or that the alleged adverse employment action was a result of plaintiff asserting her rights under Title VII. Defendant also asserts that plaintiff cannot establish a claim of breach of contract, because she cannot demonstrate that defendant failed to comply with the terms of the settlement or that she suffered any damages as a result of the alleged breach.

**A.     Title VII Retaliation Claim**

Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a). Congress thus recognized two bases for a claim of retaliation: one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.' ... And, under the participation clause, an employer may not retaliate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' ..."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174

---

[53]Defendant's Brief in Support of Summary Judgment (doc. no. 12), at 11; *see also* Complaint (doc. no. 1).

(11th Cir. 2000).  Here, plaintiff proceeds under the participation clause.

A plaintiff must prove three elements to establish a prima facie case of retaliation:  (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected activity and the adverse employment action.  *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).  Here, plaintiff has not satisfied the second element, because she has not presented any evidence demonstrating that she suffered an adverse employment action.

"An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (ADA retaliation claim); *see also, e.g., Gupta*, 212 F.3d at 587 (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).  *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits.")

"Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause'" of Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman*, 141 F.3d at 1456 (11th Cir. 1998)).

In other words, a plaintiff "must show a serious and material change" in the terms, conditions, or privileges of the job before an employment action can be described as "adverse." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). An employment action does not become "adverse" simply because an employee dislikes it, or disagrees with it. *See, e.g., Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action."). That is because "Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted).

On the other hand, "conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII." *Bass*, 256 F.3d at 1118 (citing *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Robinson*, 120 F.3d at 1300).

The question of whether an employee has suffered an employment action that is sufficiently material to be actionable normally must be determined on a case-by-case basis, *see Bass*, 256 F.3d at 1118, *Gupta*, 212 F.3d at 587, using both a subjective and an objective standard. *See Doe v. Dekalb County School District*, 145 F.3d 1441, 1448-49 (11th Cir. 1998) (recognizing that the subjective requirement is virtually almost always satisfied, and imposing an objective requirement as well). Moreover, the Eleventh Circuit also implicitly instructed district courts to view allegedly

13

retaliatory acts not only individually, but also collectively, when observing in *Wideman v. Wal-Mart Stores* "that the actions about which Wideman complain[ed] considered *collectively* [were] sufficient to constitute prohibited discrimination." *Wideman*, 141 F.3d at 1456 (emphasis supplied); *see also Gupta*, 212 F.3d at 587-90 (considering plaintiff's allegations of retaliation individually and collectively pursuant to *Wideman*, and deeming five of seven retaliatory incidents not sufficiently adverse to warrant scrutiny under Title VII).

The first act that plaintiff complains was retaliation is that Bowling assigned her an unmanageable work load. However, that assertion arises from plaintiff's acceptance of Bowling's job offer to replace his assistant, Kelly Griffin.[54] Plaintiff does not allege that Bowling forced her to accept the position as his assistant, nor does she assert that any other HRH employee told her to accept the assistant position or be terminated. In fact, from the time plaintiff filed her February 25, 2000 EEOC charge until the date of her resignation on August 15, 2000, she was never threatened with disciplinary action or termination.[55] Thus, the choice to accept the position was solely in her hands. Further, plaintiff worked as Bowling's assistant for only three days, and she did not, during that time, complain that the work load was excessive.[56]

Plaintiff also claims that Bowling's requirement that she work until 4:30 p.m. (thirty minutes past her normal 4:00 o'clock quitting time) — so that her work hours as his assistant were congruent with his own — was retaliatory. Plaintiff claims that the additional thirty minutes was "more than anybody else in the company was required to work on a daily basis."[57] As noted above, however,

---

[54]Defendant's evidentiary submission (doc. no. 11), Tab C, at 187-88.

[55]*Id.* at 216.

[56]*Id.* at 185.

[57]*Id.* at 171.

plaintiff worked as Bowling's marketing assistant for only three days. Moreover, during those three days, plaintiff remembers working until 4:30 p.m. on only one day.[58]  Working an extra thirty minutes on one occasion does not rise to the level of a substantial, tangible, or negative effect on the terms or conditions of plaintiff's employment.

Plaintiff further asserts that Bowling constantly asked her whether certain projects were completed, and that he chastised her for sending a print job to a printer that used expensive magnetic ink.  Bowling's statements, while potentially annoying or stressful to plaintiff, did not have any effect on her compensation, terms, or privileges of employment.  *See Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Repeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise to the level of such intolerable conditions that no reasonable person would remain on the job."); *see also Lucas*, 257 F.3d at 1261 ("Negative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA.").

Plaintiff also contends that HRH engaged in retaliatory conduct by failing to immediately raise her salary, immediately conduct an audit of her past commission sales, and immediately assign her an office, all as required by the settlement agreement.  Within two pay periods of the execution of the settlement agreement, however, plaintiff's salary was increased as required by the agreement, and the increase was made retroactive to June 15, just two days after the agreement was signed. HRH also completed the audit of plaintiff's past commission sales and remitted payment of the amount found owing to plaintiff within two months of the signing of the settlement agreement. Plaintiff was moved from a desk in the open office to a cubicle.  The parties dispute whether there

---

[58]Defendant's evidentiary submission (doc. no. 11), Tab C, at 150.

was an available office to which plaintiff could have been assigned.  In any case, HRH's failure to "immediately" comply with the terms of the settlement agreement does not constitute an adverse employment action.  Any delay on the part of HRH in complying with the agreed-upon terms did not substantially alter plaintiff's compensation, terms, conditions, or privileges of employment.

Even looking at the alleged retaliatory acts collectively, plaintiff's claim must fail.  The retaliatory acts alleged by plaintiff simply are not "'objectively serious and tangible enough' to alter [plaintiff's] 'compensation, terms, conditions, or privileges of employment, deprive ... her of employment opportunities or adversely affect ... her status as an employee.'" *Gupta*, 212 F.3d at 588 (quoting *Robinson*, 120 F.3d at 1300).

For the same reasons, the alleged retaliatory acts also do not support plaintiff's claim that she was constructively discharged.  In order to maintain a claim of constructive discharge, plaintiff must "demonstrate that working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000) (internal quotations and citations omitted) (finding a plaintiff's complaint that her supervisor "harassed her regarding medically necessary absences and tardiness" after filing an EEOC charge insufficient to establish constructive discharge).

**B.      Breach of Contract Claim**

Defendant argues that plaintiff cannot establish a claim of breach for contract, because she has not demonstrated that she was damaged by HRH's delay in fulfilling the terms of the settlement agreement.  Plaintiff contends that she was damaged by having to wait two months before HRH remitted the audited commission amount, by not being immediately assigned an office, and by being made a "secretary" (actually, Bowling's marketing assistant), rather than being placed in the position

16

of "Senior Technical Specialist."[59]

Both plaintiff and defendant cite Alabama case law in support of their respective arguments. While federal courts normally apply state law to breach of contract claims, a contract resolving EEOC charges, alleging a violation of federal rights, presents a different situation, as the Eleventh Circuit explained in *Eatmon v. Bristol Steel & Ironworks, Inc.*, 769 F.2d 1503 (11th Cir. 1985), when discussing the Fourth Circuit's decision in *E.E.O.C. v. Henry Beck Co.*, 729 F.2d 301 (4th Cir. 1984).

> *Henry Beck* involved what is called a "pre-determination settlement agreement." As the court explained in *Henry Beck*, such agreements are
>
>> reached pursuant to the Commission's 'Rapid Charge Processing System' adopted in 1977.  This system, which is designed to encourage pre-investigation stipulations and settlements, was the Commission's response to an increasing backlog of charges resulting from time consuming investigations. The new system has had considerable success in increasing the percentage of claims settled and in reducing the number of investigations needed.
>>
>> The Commission's regulations reflect the changes in post-filing procedures brought about by the Rapid Charge Processing System.  Specifically, 29 C.F.R. § 1601.20 provides that '[p]rior to the issuance of a determination as to reasonable cause the Commission may encourage the parties to settle the charge on terms that are mutually agreeable.... The Commission shall limit its undertaking in such settlements to an agreement not to process that charge further....'
>
> [729 F.2d] at 303.
>
> The Fourth Circuit held that suits seeking to enforce these pre-determination settlement agreements are "brought under" Title VII since they are no less effective in serving the congressional goal of conciliation and voluntary compliance than are the traditional conciliation agreements:
>
>> By allowing more frequent settlements, the PDS [pre-determination

---

[59]Plaintiff's Brief in Opposition to Motion for Summary Judgment (doc. no. 13), at 3.

17

> settlement] saves resources that might otherwise be consumed in litigation and furthers the statutory goal of voluntary compliance.   In addition, it enhances the aim of rapidly resolving disputes by encouraging early resolution before the Commission is required to expend time in investigations and reasonable cause determinations.

*Id.* at 305....

The only differences between the instant case and *Henry Beck* were that here no EEOC charges were filed and the EEOC was not a party to the agreement.  In short, while in *Henry Beck,* EEOC participation was minimal, here it was nonexistent.  But, as *Henry Beck* teaches, the crucial factor to Title VII jurisdiction over these types of cases is not EEOC participation.  It is furtherance of the congressional goal of conciliation and voluntary compliance with Title VII.  The releases entered into here, even absent EEOC participation, certainly serve and further this goal.

*Eatmon,* 769 F.2d at 1511-12.

The Eleventh Circuit revisited *Eatmon* in *Brewer v. Muscle Shoals Board of Education,* 790

F.2d 1515 (11th Cir. 1986), observing that

> [a] predetermination settlement agreement is a contract between a complaining employee and the allegedly discriminatory employer that is reached with the aid of the EEOC prior to an EEOC determination of the merits of the complaining employee's charge of discrimination.  *See Eatmon v. Bristol Steel & Ironworks, Inc.,* 769 F.2d 1503, 1511 (11th Cir. 1985) (discussion of predetermination settlement agreement in Title VII scheme).  *Construction of such an agreement is governed by principles of federal common law. Id.* at 1516-1517.  An employee need not file an EEOC charge alleging breach of the agreement to invoke the jurisdiction of a federal court over an action arising from breach of a settlement agreement.  *Id.* at 1510.

*Brewer,* 790 F.2d at 1519 (emphasis added).

On the other hand, in *Resnick v. Uccello Immobilien GMBH, Inc.,* 227 F.3d 1347 (11th Cir.

2000), addressing a claim that the defendant had breached an agreement resolving the ADA claim

asserted by plaintiff in a *judicial complaint,* the Eleventh Circuit held that "federal common law does

not apply":

18

> We generally disfavor federal common law and apply it in only rare instances concerning "rights and obligation of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Kobatake v. E.I. DuPont de Nemours and Co.*, 162 F.3d 619, 624 n.3 (11th Cir. 1998) (quoting *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981); *see also City of Huntsville v. City of Madison*, 24 F.3d 169, 172 n.3 (11th Cir. 1994). *Because this settlement agreement is between two private parties,*[60] *federal common law does not apply. Cf. Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1519 (11th Cir. 1986) (applying federal common law to interpret EEOC predetermination settlement agreement negotiated by EEOC); *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503, 1516 (11th Cir. 1985) (applying federal common law to interpret executive order conciliation agreement between government and employer).

*Resnick*, 227 F.3d at 1350 n.4 (emphasis added).

The settlement agreement in the present action is more like the ones at issue in *Eatmon* and *Brewer* than the agreement addressed in *Resnick*. Here, plaintiff filed charges with the EEOC alleging claims of discrimination against HRH. Prior to a determination by the EEOC, the parties entered into a settlement agreement, in which the EEOC agreed "to terminate its investigation." Thus, this settlement agreement meets the definition of a pre-determination agreement, as it "is a contract between a complaining employee and the allegedly discriminatory employer that is reached with the aid of the EEOC prior to an EEOC determination of the merits of the complaining employee's charge of discrimination." *Brewer*, 790 F.2d at 1519.

Even though it thus appears that federal common law, rather than axioms of state contract law, controls the interpretation of the parties' settlement agreement, the distinction ultimately amounts to no difference in outcome: the applicable principles of contract law are the same under

---

[60]In *Resnick*, the plaintiff had previously sued defendant for alleged violations of the ADA. Plaintiff and defendant entered into a settlement agreement. The district court approved the parties' settlement and retained enforcement authority. Plaintiff then sued defendant for failure to comply with the terms of the settlement. *Resnick*, 227 F.3d at 1349-50.

both federal common and Alabama law.

Under federal and Alabama contract law "[a] contract's meaning is to be determined by its language, without resort to extrinsic considerations, unless the language is ambiguous." *Eatmon*, 769 F.2d at 1518 (citing *Kimbell Foods, Inc. v. Republic National Bank*, 557 F.2d 491, 496 (5th Cir. 1977), *aff'd sub nom. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)); *see also Brewer*, 790 F.2d at 1519 (holding that, because the contract terms were ambiguous, the district court was free to consider parol evidence); *Reynolds Metals Company v. Hill*, No. 1000714, 2002 WL 27958 (Ala. Jan. 11, 2002) ("'It is well settled that parties are bound by their contracts, and that where the terms are clear and unambiguous parol evidence is not permitted....'") (citing *Davis v. Sherrill*, 540 So. 2d 708, 711 (Ala. 1989)); *State Farm Mutual Automobile Insurance Company v. Brackett*, 527 So.2d 1249, 1251 (Ala. 1988) ("the release in question was clear and unambiguous in its release of the claims in question, and, therefore, that parol evidence was inadmissible to vary its terms"). Upon review of the settlement agreement at issue here, this court finds that its terms are clear and unambiguous.

Plaintiff argues that the agreement required HRH to conduct an audit of her previous commission sales for the period ending March 1, 2000, and to pay her any money owed as a result of the audit within ten days of signing the agreement. That portion of the settlement agreement upon which plaintiff relies states: "G. Parties agree that an audit will be performed of CP's commission for the period ending 3/1/00, to determine, what if any amounts, under her contract are due her to be completed within 10 DAYS. When completed, AUDIT will be shown to CP."[61]  Thus the contract clearly provides that the *audit* was to be completed within ten days, then submitted to

---

[61]Defendant's evidentiary submission (doc. no. 11), Tab C, Exhibit 4, at unnumbered page 2-3.

plaintiff (as the complaining party) for review. The contract does not, however, specify that any money due plaintiff as commissions would be *paid* within ten days. While the audit was not completed within ten days, plaintiff has neither alleged nor offered any proof of specific damages caused by the delay.

Plaintiff next argues that she was forced to wait one month before receiving an increase in salary. As to this issue, the pertinent part of the settlement agreement states: "Salary to be [$]40,000 per year, with an increase of $2500/yr. in 6 months plus another increase of $2500/yr. after additional 6 months with satisfactory performance."[62] The settlement agreement does not specify the date on which HRH was to implement plaintiff's salary increase. Even so, HRH increased plaintiff's salary within two pay periods, and made the change retroactive to June 15, just two days after the parties executed their agreement. Again, plaintiff does not show any specific damages caused by the alleged breach.

Plaintiff also argues that HRH did not immediately assign her to an office and, therefore, failed to comply with that provision of the settlement requirement stating that plaintiff would "be given an office, if available in immediate depart[ment], CP [Complaining Party] understands that office will be moving in the near future and that CP will be given comparable space, as other similar employees, most likely a cubicle." When plaintiff first moved to the TPA department, she was assigned a desk in the office's common area. After she filed her EEOC charges and settled the claim with HRH, plaintiff was moved to a cubicle. While the parties dispute whether there were offices available "within the immediate department" that could have been assigned to plaintiff, plaintiff makes no demand for specific performance of the contractual obligation, nor does she allege specific

---

[62]Defendant's evidentiary submission (doc. no. 11), Tab C, Exhibit 4, at unnumbered page 2-3.

damages suffered as a result of any breach committed by HRH.

Lastly, plaintiff contends that her title was never changed to "Senior Technical Specialist" as required by the settlement agreement. However, HRH's failure to change plaintiff's title is of no consequence, because — subsequent to the execution of the settlement agreement — plaintiff was offered and accepted another position, which she admits was preferable to the position of Senior Technical Specialist.[63] Therefore, plaintiff has not demonstrated that she suffered any damage as to HRH's failure to change her job title.

## IV. CONCLUSION

For all of the foregoing reasons, as well as those expressed by defendant in its brief, plaintiff's claims of retaliation in violation of Title VII and breach of contract must fail, and defendant is entitled to summary judgment. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _13th_ day of March, 2002.

United States District Judge

---

[63]Defendant's evidentiary submission (doc. no. 11), Tab C, at 154.